Donald WILLIAMS, Appellant in 81–2276,

v.

V. I. WATER & POWER AUTHORITY, et al.

Appeal of VIRGIN ISLANDS WATER AND POWER AUTHORITY, in 81–2241.

Nos. 81–2241, 81–2276.

United States Court of Appeals, Third Circuit.

Argued Dec. 9, 1981.

Decided March 2, 1982.

John G. Short (argued), Dudley, Dudley & Topper, St. Thomas, U.S. V.I., for V.I. Power & Water Co.

Allan A. Christian, Frederiksted, V.I., for Donald Williams.

Before HUNTER, VAN DUSEN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

Defendant Virgin Islands Water and Power Authority ("WAPA") appeals a jury verdict of $22,000 awarded to plaintiff Donald Williams in a breach of contract suit arising out of WAPA's act in ceasing to provide electrical service to certain rental units owned by plaintiff at Nos. 5 and 8 Grove Place ("Nos. 5 and 8," "rental units").[1] We will reverse, for the following reasons:

A. The evidence showed that there was no contract between WAPA and Mr. Williams for the provision of power to the rental units at No. 5.

B. The evidence introduced by defendant showed that there was a contract between WAPA and Mr. Williams for the provision of electrical power to a pump at No. 8. Plaintiff introduced insufficient evidence of a contract between WAPA and Mr. Williams for the provision of power to the rental units at No. 8 to allow the jury to find that such a contract existed and to award damages based on is breach.

C. Plaintiff's evidence as to damages was insufficient, as a matter of law, to justify any award to Mr. Williams by the jury.

*I. Procedural History Prior to the Trial in Civil No. 78/3*

The suit now before us began on January 6, 1978, when plaintiff/appellee Donald Williams filed a complaint alleging that WAPA breached its contracts with plaintiff when WAPA ceased on October 30, 1973, to provide electrical power to the rental units at Nos. 5 and 8. Mr. Williams seeks damages for lost rentals allegedly caused by the breach. This suit, Civil No. 78/3, was based solely upon WAPA's alleged breach of contract.

On or about July 17, 1974, Mr. Williams had filed a complaint against WAPA seeking, *inter alia*, damages for WAPA's actions in ceasing on October 30, 1973, to provide electrical power to Nos. 5 and 8 (Civil No. 74/363). In the 1974 complaint, Mr. Williams alleged that WAPA's actions were "in violation of Plaintiff's contractual rights" and "a deprivation under color of law of Plaintiff's constitutional rights to due process, i.e., notice and hearing." Appendix at 397–98; paragraphs 7 and 10 of the amended complaint in 74/363. Plaintiff was represented by counsel in Civil No. 74/363.

---

1. The total awarded to plaintiff was $24,320.00: $22,000 in damages, $632.50 in costs, and $1687.50 in attorney's fees. Appendix at 384.

During the trial, plaintiff dropped his claim for punitive damages. Appendix at 144.

WAPA moved to dismiss Civil No. 78/3 on res judicata grounds, arguing that Civil No. 74/363 barred this action. The trial court denied the motion stating:

Review of the file in Civil No. 74/363 reveals that it was an action both in contract and under 42 U.S.C. Sec. 1983. By order of this Court dated 10 July, 1975, that action was dismissed with prejudice as to the Sec. 1983 claim, but with leave to amend the complaint so as to restate an action in contract. Because an amended complaint was not filed in that action, Civil No. 74/363 was dismissed for lack of prosecution on 22 November, 1978.

The present action, Civil No. 78/3 was commenced 6 January, 1978, approximately six [*sic*] months after Civil No. 74/363 was dismissed with leave to amend. Although Civil No. 74/363 was eventually dismissed unconditionally for reasons of judicial economy, this did not occur until some twenty-two (22) [*sic*] months after commencement of the present action. It necessarily follows that the case at bar was initiated at a time when the contract action remained viable and that the subsequent final dismissal of Civil No. 74/363 did not act to bar the prosecution of this action.

Appendix at 33–34.

In 1978, Mr. Williams filed a pro se action alleging damages based upon WAPA's action in turning off the power to Nos. 5 and 8 (Civil No. 78/190). On May 30, 1980, the trial court dismissed Civil No. 78/190 with prejudice on res judicata grounds. Appendix at 403. In its order, the trial court stated that "the complaint [in 78/190] is essentially identical to that of a prior action brought by plaintiff under 42 U.S.C. Section 1983 in Civil No. 74/363. That action was dismissed on the merits by order of this Court dated 10 July, 1975." *Id.*

Civil No. 78/3 seeks damages solely for breach of contract. Plaintiff does not seek damages herein based on any theory that his constitutional rights were violated by WAPA, and it is clear from the history of this case that any such claim would be barred by the doctrine of res judicata.[2]

## II. The Trial in Civil No. 78/3

Because we must determine whether the evidence was sufficient to allow the jury to award damages to plaintiff, it is necessary to review in detail the evidence adduced at trial.

### A. Plaintiff's Case

The first witness called by plaintiff was George Suarez, an employee of the Department of Public Works ("DPW"). He testified that DPW enforces the Building Code (29 V.I.C. §§ 291–312, effective May 1, 1964) and the Housing Code (29 V.I.C. §§ 330–334, effective May 1, 1964).[3] He inspected Nos. 5 and 8 Grove Place in 1973, and found violations of the Building Code. In the course of his inspection, Mr. Suarez discovered "that the two meters [on the lots] were being used in violation of their intended use," appendix at 79. The violation "dealt with an interdepartmental agreement that Public Works would notify WAPA any time someone who got a temporary permit to get electrical power for construction purposes or who was using—who had power connection for the use of a well or something like that that has changed—[.]" *Id.* Mr. Suarez also testified that "[t]he violation was that the intended use of the power was violated," and that it is "[DPW's] responsibility" to notify WAPA of such violations. Appendix at 80.

Plaintiff next called Bodil Simmons, a WAPA employee. She testified that she had no documents with her which would show whether or not there was any delinquency in Mr. Williams' accounts for Nos. 5 and 8 Grove Place as of October 1973. Appendix at 87–88.[4] During her testimony,

---

**2.** In light of the result herein, we do not reach WAPA's contention that Civil No. 78/3 is barred by res judicata in its entirety.

**3.** Mr. Suarez' direct testimony appears in the appendix at 72–85. His testimony on cross-examination appears in the appendix at 86–87.

**4.** Ms. Simmons' direct testimony is at 87–88 of

plaintiff's Exhibits 3 and 4, the notices from DPW to WAPA of impermissible use of electrical connections at Nos. 8 and 5, respectively, were admitted on motion by plaintiff.

Plaintiff's third witness was Hector Rodriguez, a WAPA employee.[5] He testified that WAPA does not inspect property before installing a meter on that property, because it is DPW's responsibility to inspect buildings, and not WAPA's. Appendix at 92. He further testified that DPW "order[ed]" WAPA to turn off the electricity, appendix at 93, and that WAPA was obligated to comply, appendix at 93–94. On cross-examination, Mr. Rodriguez testified that, once a meter is installed, it is the responsibility of the owner to wire the meter to the property.

The next witness called was Donald Farrelly.[6] A DPW employee, he testified to the existence of electrical deficiencies at Nos. 5 and 8. The power was off at the time of his inspection. During his testimony, several of defendant's exhibits concerning the condition of the rental units were admitted upon motion by defendant.

Plaintiff next called Simon Montoute.[7] Mr. Montoute testified that he was a tenant at No. 8 from 1970 to November 1974, more than a year after electrical service was terminated on October 30, 1973. Appendix at 107–08. He paid his own rent and helped Mr. Williams to collect rent from others. He testified that the total rent from all tenants on No. 8 was not less than $800 per month. Appendix at 114. The cross-examination dealt solely with the number of people living at No. 8.

Plaintiff then called John Lewis.[8] Mr. Lewis lived at No. 8 from 1970–1975, appendix at 118, and continued to pay rent after October 30, 1973, when the property was no longer being supplied with electricity. Appendix at 121.

Plaintiff's final witness was Mr. Williams, the plaintiff.[9] He testified that the power was turned off on October 30, 1973. Appendix at 127. He received approximately $1120 per month in gross rentals from No. 8, and $630 from No. 5. Appendix at 124. Thirty percent of his gross rental income went to expenses. Appendix at 131. Mr. Williams was then asked: "And for what period of time are you claiming that you lost this gross rental income of a little over $1700.00?" He answered: "Well, from the 30th of October to July, about 1975, when the last person moved out. That's all I'm asking for. About the lumber and so forth that I lost, I didn't even charge WAPA for that. All I'm asking for, the expense, the money I was to get between that time, but different to that I loose all what I had." Appendix at 131.[10] Mr. Williams also testified that DPW "harass[ed] me most of the time [with respect to Building Code deficiencies on the properties]," appendix at 127, that he had been taken to court by the Virgin Islands Government prior to 1973, and that the government had

---

the appendix. There was no cross-examination.

There is some uncertainty in the transcript as to the correct spelling of Ms. Simmons' name. We have adopted the spelling "Simmons" throughout this opinion.

5. Mr. Rodriguez' direct testimony appears in the appendix at 89–95. The cross-examination is at 95–97 in the appendix.

6. Mr. Farrelly's direct testimony appears at pages 98–101 of the appendix; his testimony on cross-examination appears at 101–05 of the appendix.

7. Mr. Montoute's direct testimony appears in the appendix at 106–15; his testimony on cross-examination appears in the appendix at 115–16.

8. Mr. Lewis' direct testimony is in the appendix at 117–21. There was no cross-examination.

9. Mr. Williams' direct testimony is at 121–36 of the appendix; his cross-examination is at 136–40 of the appendix.

10. This was the sole evidence supporting the claim for lost rent. Mr. Williams was never asked *whether* he lost the rental income. A question posed as to *when* the tenants moved out was never answered. Appendix at 136. No one asked *why* the tenants moved out (if they did).

charged that he "had substandard houses." Appendix at 134–35.[11]

Mr. Williams also testified that power was provided to the rental units at No. 5 pursuant to a contract between Mr. Luby, a tenant, and WAPA. The bills were paid directly to WAPA. Mr. Williams had wanted this arrangement because his tenants were reluctant to pay him at the end of each month for the electricity supplied to the rental units. Appendix at 124–25.[12]

On cross-examination, Mr. Williams testified that he never filed income tax forms, and had filed none for 1973. Appendix at 137. He also reiterated that the contract with WAPA for electricity to be supplied to the rental units at No. 5 was between Samuel Luby and WAPA, and that the tenants at No. 5 paid WAPA bills directly to WAPA. Appendix at 139.[13]

### B. Defendant's Motion for a Directed Verdict

After the plaintiff rested, defendant moved for a directed verdict on the grounds that the evidence on damages was inadequate, unclear, speculative, undocumented, or nonexistent; that the contract at No. 5 was in Mr. Luby's name and that plaintiff could not collect damages for breach of a contract between Mr. Luby and WAPA; that there was no evidence of any contracts between WAPA and Mr. Williams; and that there was evidence of a contract between Mr. Luby and WAPA for No. 5, but no evidence that there was any contract at all for the provision of power to the rental units at No. 8. Appendix at 141–43. The trial judge reserved his ruling on the motion, although he ultimately denied it upon WAPA's request for a definitive ruling at the close of the entire case. Appendix at 289. The court stated that, although the written contracts were not in evidence, there had been testimony as to the existence of contracts to supply electricity to Nos. 5 and 8, and that in the absence of a "best evidence rule" objection from defendant which "would have either brought those contracts out or eliminated the verbal testimony that is now before the court," the "verbal testimony . . . that I'm going to stand on is the contract." Appendix at 143. He also stated that evidence as to damages was meager, but that there was "some semblance of some damages." Appendix at 145.[14]

### C. Defendant's Case

Defendant's first witness was Bodil Simmons, who had previously testified for

---

11. Mr. Williams argued below and contends here that WAPA and DPW acquiesced in his conduct. His own testimony hardly supports that conclusion.

12. There was no testimony that Mr. Luby was in any way obligated to take over the contract, or that he received any benefit for so doing.

13. There were apparently two meters on and two contracts for the provision of power to No. 5. One meter supplied the house in which Mr. Williams lived; that house had been connected in 1945, under a contract between Mr. Williams and WAPA. The other meter supplied the rental units, under a contract between Mr. Luby and WAPA. Appendix at 132–33 (direct testimony of Mr. Williams). The trial court stated that there was no evidence of any damages caused by the termination of electricity to the house at No. 5. Appendix at 145. In any event, plaintiff seeks damages for the loss of rental income. Thus, he seeks damages only for the alleged breach of the WAPA/Luby contract at No. 5, and not for the alleged breach of the alleged WAPA/Williams contract at No. 5.

14. The trial court stated:

[I]n the 20-month period that you are talking about, all the tenants had gone. You made no attempt to show how many tenants left, how many stayed; yet you're claiming the full $1700.00 for that entire period. Don't we know from people who testified—one of them didn't leave until December of '74, and another stayed until '75. We don't know how many others stayed. That's why I asked the question did all of them move out together, hoping from that you would try to elicit, if you could, how they moved out so we would know what months he was totally without tenants, what month he had half his tenants. I tried very hard to determine what his loss is, but I am not sure it would be in the interests of justice now to dismiss this case. There's some semblance of some damages. Appendix at 144–45. Mr. Williams never answered the question referred to by the trial court.

plaintiff.[15] In the course of her testimony, the two contracts between Mr. Williams and WAPA, which had been pre-numbered by plaintiff as Exhibits 1 and 2, were admitted into evidence on motion by defendant as part of defendant's case. Appendix at 151. Paragraph One of the contracts, which was printed, provided:

### APPLICATION AND CONTRACT

#### for Residential or Commercial Electric Service

The undersigned hereby authorizes and requests the Virgin Islands Water and Power Authority to furnish electric service for his own use at any address which he may designate within the territory served by the said Authority, and agrees to pay for said electric service with the understanding that the furnishing of the service, the charges therefor and the time of payment thereof are to be in accordance with the Authority's rules and regulations and general terms and conditions on file at the Authority's General Office.

15. Ms. Simmons' direct testimony as a WAPA witness is at 147–64 of the appendix. Her cross-examination is at 164–68 of the appendix.

16. The testimony as to No. 8 was somewhat confusing. At its most advantageous to plaintiff, it was that no Certificate of Use was initially required as to No. 8.

17. During the cross-examination, and in the presence of the jury, the following dialogue took place:

BY ATTORNEY CHRISTIAN [plaintiff's attorney]:

Q. Miss Simmons, is it the practice of WAPA to terminate the power of a customer without giving them a chance to correct whatever deficiencies exist?

A. In this case it would not be WAPA's responsibility to do that. Public Works is the one who authorized the disconnection of service because they are, in fact, responsible to make sure that the property is meeting up with the V.I. Code. That is not WAPA's responsibility.

THE COURT: So any time Public Works tell you to disconnect somebody's current, you disconnect it?

THE WITNESS: Based on something like this.

THE COURT: Something like what?

Appendix at 291–92. The printed portions of the two contracts are identical. The two contracts asked for certain information and had blank spaces to be filled in. Plaintiff's Exhibit 1, which was signed by Mr. Williams on May 1, 1970, stated that the premises to be served were No. 8 Grove Place, and that the power was to be supplied to a "New Installation" "Construction Pump." The word "pump" was handwritten in two places in the contract. Appendix at 291. Plaintiff's Exhibit 2, which was dated July 26, 1968 and signed by Mr. Williams, requested power for an "old installation" at No. 5 Grove Place. Appendix at 292.

Ms. Simmons testified, on direct examination, that no Certificate of Use was initially necessary as to No. 8, because service was requested for a pump, not a residence. Appendix at 161.[16] She also testified that a Certificate of Use was not required as to No. 5, which had requested power for a pre-existing building. Appendix at 161–62. Ms. Simmons further testified, however, that "If additional buildings was put up there, they will need a [sic] Occupancy Permit." Appendix at 162.[17]

THE WITNESS: That the person who had the service does not have an Occupancy Permit.

THE COURT: But you just said that they didn't need an Occupancy Permit for either one of those two contracts. That's what you testified.

THE WITNESS: What I testified here is that the one for a pump—

THE COURT: You didn't need—

THE WITNESS: Does not need a Certificate of Occupancy.

THE COURT: And you said also where it showed that there had been a previous tenant you don't require it either.

THE WITNESS: Exactly.

THE COURT: So, the one was for a pump, and the other showed that there was a previous tenant, so neither one required the Occupancy Permit according to what you say.

THE WITNESS: Exactly.

THE COURT: So, when you got that notice from Public Works, you just went and cut it off anyway?

THE WITNESS: We went and cut it off based on what the notice is saying here.

THE COURT: But if you had looked at your contract, you might have found out what you just told us, that you didn't need it?

THE WITNESS: Yes, but these two papers that are saying here is that when Public

On cross-examination, in response to questioning from the court, Ms. Simmons read to the jury the following from the electrical contract:

> [the provision of power is] '... with the understanding that the furnishing of service, the charges therefor and the time of payment thereof are to be in accordance with the Authority's rules and regulations.'

Appendix at 167. She also read into evidence Section 34 of the WAPA regulations:

> 'The Authority assume [*sic*] no responsibility for the inspection of any wiring beyond the delivery point. The Authority will not energize any building which has not been inspected by the municipal government and a Certificate of Inspection has been issued.'

Appendix at 167. In response to further questioning from plaintiff's counsel, Ms. Simmons testified that the contract made all of WAPA's rules and regulations applicable to the customer, and that the passage of the contract read to the jury accomplished that incorporation. Appendix at 168.

Defendant then called Roy Sealey, who was at DPW in 1973. He testified that the rental apartments at Nos. 5 and 8 were fairly new. Appendix at 170–76. On cross-examination, he agreed that it was possible that the buildings had been recently renovated. Appendix at 177.

Defendant then called Claude Richards, a DPW inspector.[18] Mr. Richards testified that the rental units at Nos. 5 and 8 were substandard, were built after the Building Code went into effect, and were not present in 1968. Appendix at 180–89. On cross-examination, Mr. Richards testified that the rental units had not been built before 1972. Appendix at 190.

At defendant's request, after all the witnesses testified, the court read into evidence a portion of a deposition of Mr. Williams. The deposition had been taken in the course of a law suit irrelevant here, on April 16, 1971. During the deposition Mr. Williams testified that he had not put up any rental units on No. 8 prior to 1971 and that he had put up several houses on No. 8 in 1971. Appendix at 239.[19]

### D. The Exhibits

Plaintiff introduced only two exhibits: the notices from DPW to WAPA requesting that the power to Nos. 5 and 8 be disconnected. Defendant introduced the two

---

Works checked the location out, it was not meeting up with the V.I. Code. Even though we put service there for a pump, we put service there for a house, and might not have need [*sic*] Certificate of Occupancy at the time. The reason why Public Works would have sent these is because something had to be changed there.

THE COURT: I see. So, you relied purely on what Public Works said?

THE WITNESS: Yes.

Appendix at 164–66.

The court, in the above quoted dialogue, ignored the witness' prior testimony (appendix at 162) that plaintiff would need an occupancy permit if additional buildings were built. Since the power was being supplied to rental units at the time of its termination, and not just to a pump, the conclusion that additional buildings were constructed on the site is inescapable. Thus, plaintiff apparently did need a Certificate of Occupancy for No. 8.

During a discussion with counsel, the trial court stated that WAPA "had an obligation to ask to see a building permit [when it connected a meter to the rental units at No. 5], and, it [*sic*] it didn't it cannot complain that it had no knowledge of it." Appendix at 286–87. We are unable to find anything in the record supporting the trial court's placing of the burden on WAPA to ask for the necessary certificates.

18. Mr. Richards' direct testimony is in the appendix at 178–89; his testimony on cross-examination is in the appendix at 189–90.

19. In a colloquy with counsel, the trial court stated that plaintiff had testified that the rental units were built prior to the effective date of the Building Code in 1964. Appendix at 200–01. As a result of access to a transcript, we have been able to ascertain that the trial court's recollection was incorrect. There was evidence that the rental units were all constructed in 1971 or later, well after the Building Code went into effect, and *no* evidence that they were constructed prior to the effective date of the Building Code. As is discussed *infra*, the fact that the rental units were built in 1971 at the earliest is important in determining whether WAPA or DPW acquiesced in their existence.

WAPA/Williams contracts and various other exhibits, including copies of several statutes, tending to show the substandard nature of the rental units, their date of construction, and the nature of prior litigation between Mr. Williams and WAPA.

### E. Jury Instructions

Each side submitted proposed jury instructions commensurate with its theory of the case. Exceptions were apparently taken by defendant at all appropriate times. Appendix at 280–87. In any event, plaintiff on appeal does not contend that defendant waived any of its objections.

After trial, WAPA filed a motion for a new trial, remittitur or modification. Appendix at 386–94. That motion was denied. Appendix at 416.

### III. Discussion

On appeal, defendant contends, *inter alia*, that the WAPA/Luby contract should not have been included in any way in the case, that there was insufficient evidence to support the verdict, and that plaintiff's argument that he had the right to notice and a hearing was barred by res judicata.[20]

### A. No. 5: The WAPA/Luby Contract

■ Both sides agree that power to the rental units on No. 5 was provided by WAPA pursuant to a contract between one Samuel Luby and WAPA, and not pursuant to any contract between Mr. Williams and WAPA.[21] On appeal, Mr. Williams contends that he was a third party beneficiary of the WAPA/Luby contract and therefore entitled to sue on that contract. We disagree. Assuming for the purposes of argument only that WAPA breached the WAPA/Luby contract, there was no evidence from which the jury could conclude that Williams was a third party beneficiary of the WAPA/Luby contract entitled to sue on that contract.

The Restatement [Second] of Contracts provides:[22]

§ 302. Intended and Incidental Beneficiaries

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties *and* either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

\*　　\*　　\*　　\*　　\*　　\*

---

**20.** With regard to the notice and hearing issue, the trial court charged the jury as follows:

But even if you were to find that WAPA did not wrongfully terminate the contract, the termination could not lawfully be accomplished without reasonable notice from WAPA to Mr. Williams .... The law does not countenance summary termination of power without notice an [sic] opportunity to be heard.

Appendix at 275. In Plaintiff's Memorandum in Opposition to Defendant's Motion for New Trial, plaintiff states that the right to notice and a hearing in this case is based on "due process." Appendix at 409. This constitutional argument, which was raised in 74/363 and dismissed on the merits and in 78/190 and dismissed as res judicata, is barred here by res judicata, and it was error to include the issue in the case.

There was no evidence that Mr. Williams received notice or an opportunity to be heard. Thus, the above instruction would compel the jury to conclude that WAPA acted unlawfully in ceasing to provide power to Nos. 5 and 8. Because the inclusion of this instruction on a barred issue was prejudicial to defendant, at the least WAPA would be entitled to a new trial. However, given the result here, we need not reach this issue.

**21.** The trial court, over defendant's objection, sua sponte amended the complaint to plead the WAPA/Luby contract as one of the contracts sued upon by Mr. Williams. Appendix at 286.

**22.** The Virgin Islands Code states:

The rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary.

1 V.I.C. § 4.

§ 315. Effect of a Promise of Incidental Benefit

An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee.

(Emphasis added.)

In order for plaintiff to be able to sue on the WAPA/Luby contract, he would have to show that giving him a right to performance by WAPA effectuates the intent of both parties to the contract. While there was evidence that plaintiff intended a benefit to himself from the WAPA/Luby contract, there was no evidence that Mr. Luby, one of the parties to the contract, intended to benefit plaintiff, and no evidence that WAPA, the other party to the contract, intended to benefit plaintiff. Indeed, there was no evidence at all as to the intent of either party to the contract. Thus, Mr. Williams cannot sue on the WAPA/Luby contract under the Restatement [Second] of Contracts.[23]

■ Plaintiff contends specifically that he was a creditor beneficiary of the WAPA/Luby contract. The Restatement [First] of Contracts defines a creditor beneficiary as follows:

§ 133. Definition of ... Creditor Beneficiary...

(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is ...:

\* \* \* \* \* \*

(b) a creditor beneficiary if ... performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary....

Here, there was no showing by plaintiff that Mr. Luby (the promisee for purposes of the analysis here) had any obligation to Mr. Williams (the beneficiary) which would be satisfied by performance of the WAPA/Luby contract by WAPA (the promisor). Thus, Mr. Williams does not fit into the category of creditor beneficiary here.[24]

We conclude that Mr. Williams was not entitled to sue for damages based on the WAPA/Luby contract, and therefore was not entitled to recover damages (assuming there were any) emanating from WAPA's actions in ceasing to provide power to the rental units at No. 5.

■ Finally, even if we assume for the purpose of argument only that Mr. Williams is entitled to the benefits of the WAPA/Luby contract, plaintiff introduced no evidence that WAPA breached that contract. Even if it would have constituted a breach for WAPA to turn off the power at a time when the account was not overdue, there was no evidence that the Luby account was current. There was evidence from which the jury could infer that the accounts which were in Mr. Williams' name were current, but there was no such evidence as to the WAPA/Luby account. Since Mr. Luby was billed directly by and paid bills directly to WAPA, Mr. Williams would have had no knowledge of the status of that account. In any event, he was not asked if he had such knowledge.

### B. No. 8: The Pump Contract

Defendant, as part of its own case, introduced the contract between Mr. Williams

---

**23.** Even if it is arguable from the facts here that Mr. Luby intended to benefit plaintiff, there is no evidence of any intent by WAPA to benefit plaintiff.

In light of the absence of evidence as to the parties' intent, we do not need to examine whether plaintiff fits the criteria set forth in §§ 302(1)(a) and (b).

**24.** Nor does plaintiff fit the Restatement definition of donee beneficiary. Restatement [First]

of Contracts, § 133(1)(a). As under the Restatement [Second] of Contracts, an incidental beneficiary, into which category Mr. Williams falls because he is neither a creditor nor a donee beneficiary, acquires no right from the contract. *See* Restatement [First] of Contracts § 147. Thus, plaintiff cannot sue on the WAPA/Luby contract under the Restatement [First] of Contracts.

and WAPA for the provision of power to No. 8. Appendix at 151, 291. That contract, which was pre-marked Plaintiff's Exhibit 1, provided for the provision of power to No. 8 for a new installation/construction pump. The trial court instructed the jury as follows:

> The jury is further instructed that whether or not Mr. Williams was in violation of either the· Building Code, or the Housing Code or both, if you find that WAPA knew of such violations and/or his wrongful connection of his houses to the pump, or, if WAPA did not actually know of it but in the proper conduct of its business through its employees should have known of these alleged acts of Mr. Williams, and, if you further find tht, [sic] therefore, WAPA continued to supply electrical power to the plaintiff's units, continued to bill him for the same, continued to collect monies as billed and continued this course of conduct for a sustained period, as the plaintiff's evi-

dence tends to suggest, then you may find that WAPA acted wrongfully in terminating service to Mr. Williams the more so because they gave him no notice and no opportunity to be heard . . . .

Appendix at 275–76.

█ There was no evidence that the rental units at No. 8 complied with either the Housing Code or the Building Code, and there was considerable evidence that they did not. There was no evidence that WAPA had acquiesced over a "sustained period" in plaintiff's conduct in switching the power from the pump to the rental units or in maintaining substandard housing at Nos. 5 and 8. To the contrary, the evidence at trial showed that DPW had persistently sought to compel plaintiff's compliance with the Housing and Building Codes. *See* appendix at 76–78; 134–35. Plaintiff himself testified that "[DPW] used to harass me [about Building Code deficiencies on the properties] most of the time . . . ." Appendix at 127.[25]

**25.** The only evidence as to the date the rental units were constructed showed that they were built no earlier than 1971. The record contains the following documents: (1) an order dated June 1, 1971, in *Government of the Virgin Islands v. Williams*, Cr. 198/71, giving Donald Williams until June 29, 1971 to decide to comply with the Building Code, and ordering him to evict his tenants if he did not comply; and (2) the complaint in Cr. 198/71, charging Donald Williams with failing to obtain a Certificate of Use for "shacks" at Nos. 5, 7 and 8 Grove Place. Those documents were filed by *plaintiff* as exhibits to plaintiff's motion in limine requesting that the trial judge exclude evidence that the rental units at Nos. 5 and 8 were substandard from the trial of 78/3 because "[t]he issue of substandard housing has already been litigated in Criminal No. 198/71." Plaintiff's Motion in Limine, ¶ 1. WAPA opposed plaintiff's motion, arguing that plaintiff was collaterally estopped by Cr. 198/71 from contending that the Building Code did not apply to the rental units.

WAPA's counsel apparently did not seek a ruling at trial that plaintiff was estopped by Cr. 198/71 from denying that the Building Code applied to the rental units. Moreover, the trial court charged the jury that plaintiff's evidence suggested that the Virgin Islands authorities had acquiesced in plaintiff's conduct and the state of the rental units over a substantial period of time; WAPA's counsel did not seek a contrary instruction on the basis of the docu-

ments in Cr. 198/71. Thus, although the documents in Cr. 198/71 would tend to refute any argument that WAPA or DPW acquiesced in plaintiff's conduct, they were not before the jury. It is to be noted that the June 1, 1971 order in Cr. 198/71 was pre-marked as Plaintiff's Exhibit 9 (appendix at 300); the record does not, however, indicate that its admission into evidence was ever sought or granted.

Even though the documents from Cr. 198/71 were not admitted, there was evidence before the jury that DPW had been trying to compel plaintiff to comply with the Codes, and there was insufficient evidence to allow the jury to infer official acquiescence.

As in the trial court, defendant argues in this court that the connection to the rental units at No. 8 was illegal. In response to that argument, plaintiff points to the contract for No. 8. Appellee's Brief at 12. That contract does not help plaintiff. The WAPA/Williams contract for No. 8 on its face provides for power to a pump for construction purposes. There was testimony that the rules and regulations would have required Mr. Williams to obtain a certificate of occupancy if he wished to change the supply from a pump to housing. There was no evidence contradicting this interpretation of the rules. Thus, if the WAPA/Williams contract for No. 8 was breached, under the evidence in this case it was arguably plaintiff who breached it.

Thus, there was insufficient evidence that any contract existed for the provision of electricity by WAPA to the rental units at No. 8, insufficient evidence that any agency had acquiesced in the change from pump to rental units or in the condition of the rental units, and *a fortiori* insufficient evidence to allow the jury to award damages to plaintiff for WAPA's action in ceasing to provide electricity to the rental units at No. 8.

### C. Nos. 5 and 8: The Sufficiency of the Evidence

■ Assuming for the purposes of argument that Mr. Williams had contracts with WAPA for the provision of power to the rental units at Nos. 5 and 8, and that WAPA breached those contracts when it turned off the power on October 30, 1973, Mr. Williams is not entitled to collect his lost net rentals because there was inadequate proof of any damages emanating from the breach. There was no testimony that any tenant left because of WAPA's actions in ceasing to provide electricity.[26] The only two tenants who testified stated that they remained for more than a year after the electricity was cut off; they did not testify as to why they left. One testified that he continued to pay rent after the electricity was cut off; the other did not testify that he stopped paying rent. The sole evidence introduced by plaintiff in support of any award of damages at all was Mr. Williams' testimony that he was seeking lost rental for the period from October 30, 1973 to July 1975. However, plaintiff himself introduced evidence that his tenants had not departed or stopped paying rent when the electricity was disconnected, and there was no evidence that the October 30, 1973, cut off had caused plaintiff to lose any rentals.[27]

There was no reasonable way in this case for the jury to calculate damages. Indeed, in the course of giving his reasons for refusing to grant defendant's motion for a directed verdict, the trial court implied that he was himself unable to calculate plaintiff's damages. Appendix 144–45.

For the foregoing reasons, we conclude that there was insufficient evidence to support the verdict. The judgment below will be reversed, and judgment will be entered for defendant.

---

**26.** There was no testimony that any tenant moved out in response to the power cessation on October 30, 1973. There was testimony from plaintiff that the buildings were empty by July, 1975, the *end* of the period for which damages were sought, but no evidence as to when or why the tenants had left.

**27.** Plaintiff argued to the court below that the rental units were constructed prior to 1964, the effective date of the Building Code. This was not an issue that should have been before the jury, *see* n. 19, *supra.* However, assuming for purposes of argument that the rental units at No. 8 were constructed before 1964, the earliest date on which those units could have received any electricity is May 1, 1970, the date Mr. Williams first applied for electricity for the pump at No. 8. Thus, according to plaintiff's own contentions, the tenants had no electricity from 1964 to 1970 at the earliest. Plaintiff's contention that he lost all his rentals from October 30, 1973 through 1975 is thus undermined: if his tenants had no electricity from 1964 to 1970, it is unlikely that they would have moved out *en masse* when the electricity was disconnected. In any event, there was no evidence that they did.