**KINNEL, Eugene F., Appellee,**

v.

**MID–ATLANTIC MAUSOLEUMS, INC., et al., Appellants.**

No. 87–1484.

United States Court of Appeals, Third Circuit.

Argued Jan. 7, 1988.

Decided June 23, 1988.

Gregory T. Magarity, Nancy O'Mara Ezold (argued), Stanley R. Scheiner, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for appellee.

John A. VanLuvanee (argued), Joanne D. Sommer, Eastburn and Gray, Doylestown, Pa., for appellants.

Before SEITZ, HUTCHINSON and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

The plaintiff/appellee, Eugene F. Kinnel ("Kinnel"), brought this action against defendants/appellants, Mid–Atlantic Mausoleum, Inc. ("Mid–Atlantic") and John E. Kennan ("Kennan"), seeking damages for breach of contract and for fraudulent misrepresentation.[1] Trial was bifurcated between liability and damages. With respect to liability, the jury, in response to written interrogatories, found against Mid–Atlantic.[2] No questions regarding Kennan's individual liability were included in the interrogatories submitted to the jury, and thus the jury returned no findings with respect to Kennan.

Despite the fact that the jury only found liability against Mid–Atlantic, the district court entered judgment against both Mid–Atlantic and Kennan in its May 5, 1987 order. Thereafter, in a two-day trial to determine damages, the jury found against

---

**1.** Count I of the complaint alleged that Mid–Atlantic failed to pay Kinnel finder's fees for Kinnel's efforts in connection with two churches for which Mid–Atlantic contracted to build mausoleums (St. Joseph's and St. Anthony's). Kinnel claimed in Count II that Mid–Atlantic had deprived him of his sales commissions for selling mausoleum crypts at St. Anthony's. Counts III through VI charged Mid–Atlantic and Kennan with fraud relating to the sales commissions on four different mausoleum projects including St. Joseph's and St. Anthony's.

**2.** The jury returned a verdict against Mid–Atlantic on both of the breach of contract claims and two of the four fraud claims. The jury also found for Kinnel on Kennan's and Mid–Atlantic's counterclaims.

both Mid–Atlantic and Kennan and awarded $274,000 in compensatory and $50,000 in punitive damages against Mid–Atlantic and $15,000 in compensatory and $10,001 in punitive damages against Kennan personally.

Kennan and Mid–Atlantic then filed a number of post trial motions including motions for a judgment notwithstanding the verdict and a new trial. The district court denied these motions by an opinion and order entered July 27, 1987.

On appeal, Mid–Atlantic and Kennan, present us with a multitude of claimed errors which implicate the district court's charge, the jury's verdict and the district court's judgments. Mid–Atlantic and Kennan also raise questions with respect to sufficiency of the evidence, but those questions, which we address at the outset, do not require as extensive an analysis and discussion as do the post-evidence issues.[3]

We conclude that there was sufficient evidence to support the jury's verdict against Mid–Atlantic, but hold that the district court erred when it entered judgment against Kennan. We also hold that the district court erred in its instructions re-

garding damages. Thus, we reverse and remand the case to the district court with instructions to enter a judgment in Kennan's favor and to hold a new trial on Mid–Atlantic's damages.

## I.

Mid–Atlantic is in the business of building mausoleums. Kennan is the president of Mid–Atlantic. Kinnel was a sales contractor, selling mausoleum crypts, grave cites and markers. (A202). The jury found that Kinnel was engaged by Mid–Atlantic as an independent contractor to assist in finding mausoleum projects and in selling crypts in those mausoleums. (A117–18). Kinnel testified, and the jury found, that pursuant to an oral contract he entered into with Mid–Atlantic in 1982, he was to receive a finder's fee of 3% for each mausoleum project he found for Mid–Atlantic and a 25 to 40% commission for each crypt he sold in a Mid–Atlantic mausoleum. (A117–18, 212–13). The liability interrogatories and the jury's answers to each are set out in the margin.[4]

---

**3.** Some of the arguments which appear in the briefs on appeal are not resolved by us because the issues which are raised were never properly preserved in the record below. For example, where no requests for instructions were filed and no objections to the district court's instructions were made, we will not consider those arguments here unless they constitute plain error. Fed.R.Civ.P. 51. We are not persuaded that any plain error was committed. *See e.g. Hoffman v. Sterling Drug, Inc.,* 485 F.2d 132, 138–39 (3d Cir.1973) *and see also United States v. Gibbs,* 739 F.2d 838, 849 (3d Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985).

**4.** INTERROGATORIES TO THE JURY

 1. A. Was there an oral agreement between plaintiff Kinnel and defendant Mid–Atlantic under the terms of which Mid–Atlantic agreed to pay a finders fee on projects found by Kinnel for Mid–Atlantic?
 X YES ___ NO

 B. If your answer to A. is "Yes," did Mid–Atlantic breach the contract with respect to:

 (1) St. Joseph's (Tom's River): **X** YES ___ NO

 (2) St. Anthony's (Easton): **X** YES ___ NO

 2. A. Was there an oral agreement between plaintiff Kinnel and defendant Mid–Atlantic under the terms of which Mid–Atlantic was obligated to retain Kinnel as sales manager on projects which he "found" and to use his "best efforts" to obtain commissions not lower than 25% for Catholic projects and 33%—40% for non-Catholic projects?
 X YES ___ NO

 B. If "Yes", did Mid–Atlantic breach the oral agreement with respect to St. Anthony's?
 X YES ___ NO

 C. Did Mid–Atlantic misrepresent the amount of sales commission Mid–Atlantic was receiving with respect to:

 (1) Gethsemane: ___ YES **X** NO

 (2) Mt. Carmel (Roseta): YES **X** NO

The commission paid a sales agent was typically part of the contract price negotiated by Mid–Atlantic with its customer. This arrangement reflected the financing agreements Mid–Atlantic often arranged, whereby construction costs were paid with pre-construction sales of crypts, thus making Mid–Atlantic also responsible for sales. (A219–20, 223, 232–33, 751). Mid–Atlantic would hire Kinnel to make the pre-construction crypt sales for proposed Mid–Atlantic projects. (A215–16, 751–52). Kinnel would receive the sales commissions called for in the building contract as his compensation. If Kinnel did not sell enough crypts to justify the project, construction would not begin, the money advanced would be returned, and Kinnel would not be entitled to his commissions. Kinnel testified that this had never happened on sales projects that he had managed. (A253).

The issues on this appeal arise primarily from two mausoleum projects referred to by the parties as the St. Anthony's project and the St. Joseph's project. In his complaint Kinnel alleged, *inter alia,* that Mid–Atlantic had breached its contract with him by not paying him his finder's fees for the St. Anthony's and St. Joseph's projects; that Mid–Atlantic had further breached its contract with him by firing him as a salesperson for the St. Anthony's project and thus depriving him of his St. Anthony's sales commissions; and that Mid–Atlantic and Kennan misrepresented to Kinnel the commission levels set by the contracts for four Mausoleum projects including the St. Anthony's and St. Joseph's projects, thus inducing Kinnel to accept lower commissions on his sales.

The jury found: that Mid–Atlantic had breached its contract with Kinnel on both the St. Anthony's and the St. Joseph's projects by not paying the finder's fees; that Mid–Atlantic had also breached its contract with Kinnel by firing him as salesperson for the St. Anthony's project; and that Mid–Atlantic was guilty of misrepresenting the St. Anthony's and St. Joseph's commission levels to Kinnel.[5] Though Kennan was named individually in the complaint as a defendant, the jury as mentioned earlier, was not specifically asked about his liability and thus returned no findings of liability against Kennan.

## II.

■ In addressing Mid–Atlantic and Kennan's claims of insufficient evidence to support the jury's verdict we are necessarily reviewing the district court's denial of their motion for judgment notwithstanding the verdict. In reviewing a judgment n.o.v. we must review the record in the light most favorable to the non-moving party (in this case Kinnel) and "affirm the judgment of the district court denying the motion[ ] unless the record is critically deficient of the minimum quantum of evidence from which a jury might reasonably afford relief." *Dawson v. Chrysler Corp.,* 630 F.2d 950 (3d Cir.1980) (quoting *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir.1969)).

We are not free to weigh the evidence or to pass on the credibility of witnesses. Those functions are assigned to the factfinder, in this case the jury. Our function is to determine only whether there is evidence upon which the jury could properly

(3) St. Joseph's
(Tom's River): X YES ___ NO

(4) St. Anthony's
(Easton): X YES ___ NO

3. Was plaintiff Kinnel an employee of Mid–Atlantic or an independent contractor?
Employee X Independent Contractor

4. Did plaintiff Kinnel induce Frank and Sam Saxton to break the sales contract between Cedar Hill and Mid–Atlantic?
YES X NO ___

5. With reference to Cedar Hill, what was the finders fee which Mid–Atlantic agreed to pay Kinnel?
1½% X 3%

6. A. Was the restrictive covenant agreement dated September 30, 1983 enforceable?
YES X NO

B. If "Yes", did Kinnel violate the restrictive covenant agreement?
YES ___ NO ___

**5.** *See* note 4 *supra* for jury interrogatories and answers.

return a verdict, viewing the evidence most favorably to Kinnel the non-movant, and giving Kinnel the benefit of all reasonable inferences. 9 C. Wright and A. Miller, Federal Practice and Procedure, § 2524 (1971).

We need not dwell at length on the evidence as our independent review of the record satisfies us that jury findings in favor of Kinnel and against Mid–Atlantic were supported by sufficient evidence and that accordingly the district court did not err in denying Mid–Atlantic's motion for a judgment notwithstanding the verdict.

### A.

■ Mid–Atlantic first contends that there was not sufficient evidence to support the jury's finding that Mid–Atlantic breached its contract with Kinnel when it failed to pay him finder's fees for the St. Anthony and St. Joseph's projects. Both Mid–Atlantic and Kinnel refer us to the case of *Amerofina, Inc. v. U.S. Industries, Inc.*, 232 Pa.Super. 394, 335 A.2d 448 (1975) as guiding Pennsylvania law on this issue. In *Amerofina* the Pennsylvania Superior Court stated that a finder:

> is an independent actor whose role is that of a middleman who introduces the parties, supplies information to one or both about the other and is required to do little else ... "The finder is a person whose employment is limited to bringing the parties together so that they may negotiate their own contract...." *Tyrone v. Kelley*, 9 Cal.3d 1, 106 Cal.Rptr. 761, 507 P.2d 65 (1973). Finders are not involved in "negotiating the price or any of the other terms of the transaction." ... Thus, the finder's contract is "an arrangement by which an intermediary finds, introduces, and brings together parties to a business opportunity, leaving the ultimate negotiation and consummation of the business transaction to the principals." Annot., Validity Construction and Enforcement of Business Opportunities or "Finder's Fee" Contract, 24 A.L.R.3d 1160, 1164 (1969)

*Amerofina*, 335 A.2d at 451–52. *See also Sachs v. Continental Oil Co.*, 454 F.Supp. 614 (E.D.Pa.1978) (citing *Amerofina*). The district court's charge to the jury was drawn from the above quoted language in *Amerofina* (A1730), and as we discuss below, despite the conflicting evidence, Kinnel's testimony provided ample basis for the jury to conclude that he was entitled to a finder's fee for both the St. Joseph's and St. Anthony's projects.

### 1.

Kinnel testified that he had an agreement with Mid–Atlantic to provide him with a fee equalling 3% of the construction costs for any project that he "found". (A213, 265–66, 279). With respect to St. Joseph's, Kinnel testified that at the 1983 Catholic Cemetery Convention in St. Louis, he introduced himself to Frank Ward, the Superintendent of the cemetery at St. Joseph's and discussed with Ward the possibility of a building a mausoleum. (A260). Kinnel testified that he was the first person associated with Mid–Atlantic to talk to Ward. *Id.* Following the convention, Kinnel testified that he called and later visited Ward and Monsignor Donovan, the priest in charge of St. Joseph's. (A260–61). This testimony was corroborated by Kinnel's phone bills and by his turnpike toll receipts. (A261–62). Kinnel also testified that Keenan admitted Kinnel's right to a finder's fee when he (Kennan) suggested that Mid–Atlantic could lower the price of St. Joseph's crypt cost if Kinnel could "drop the finder's fee." (A265). If believed by the jury, this testimony gave credence to Kinnel's claim that it was he, Kinnel, who "found" the St. Joseph's project.

Mid–Atlantic responded that prior to Kinnel's initial conversation with Ward, Mid–Atlantic had sent Ward brochures and had targeted both Ward and Monsignor Donovan, for special attention. (A755, 1673). Kennan testified that he had also met Ward at the 1983 St. Louis convention and that he, Kennan, had followed up that meeting with phone calls and visits. (A757–58).

### 2.

With respect to finder's fees for the St. Anthony's project, Kinnel testified that it

was he who had made the first contact with Monsignor Frost of St. Anthony's. Kinnel testified that this first meeting occurred, when he invited Monsignor Frost to a ceremony commemorating the ground-breaking of another project. (A276–77). Kinnel stated that he followed this initial meeting up with subsequent phone calls and visits to Monsignor Frost. (A278). This testimony was corroborated by an entry on Kinnel's calendar. *Id.* Kinnel further testified that Kennan was not involved in any of those initial meetings. *Id.*

As with St. Joseph's, Kennan testified that Mid–Atlantic sent St. Anthony's informational brochures prior to Kinnel's first contact. (A781). Kennan also testified that he, and not Kinnel, invited Monsignor Frost to the groundbreaking ceremony and that at the ceremony he discussed with Monsignor Frost, the possibility of engaging Mid–Atlantic to build a mausoleum for St. Anthony's. (A782). Monsignor Frost could not remember who made the first contact. (A622).

### 3.

Mid–Atlantic also challenged the sufficiency of the evidence supporting the jury's finding that it breached its contract with Kinnel to pay him sales commissions on the St. Anthony's project. It is undisputed that Kinnel was initially engaged by Mid–Atlantic to sell crypts for the proposed St. Anthony's mausoleum (A281), that he was responsible for initially selling some $130,000 worth of crypts (A294) and that nearly seven weeks after he began selling crypts at St. Anthony's project, Mid–Atlantic fired him.

Mid–Atlantic argued that Kinnel's discharge was a result of Kinnel's failure to abide by proper sales practices. In particular, Mid–Atlantic accused Kinnel of refusing to work out of the parish office (A640), not obtaining a telephone for salespeople to telephone prospects (A935), not making any effort to solicit other parishes (*id.*), refusing to use Mid–Atlantic's accounting system (A790–92), alienating an important church volunteer (*id.*), and changing the pricing structure without authorization (A638–39). Kennan contends that these actions by Kinnel voided any duty they may have had to him under the St. Anthony's contract.

Essentially, Kinnel disputed this evidence and claimed that no complaints had been made by Kennan with respect to his sales conduct until after Kinnel had confronted Kennan with the fact that the true sales commission was not 18%, but was rather 27%. Moreover, Kinnel testified that Monsignor Frost had never expressed dissatisfaction with Kinnel's performance.

### 4.

In returning its liability findings in favor of Kinnel and against Mid–Atlantic on the St. Joseph's and St. Anthony's breach of contract claims (Counts I and II), *see* note 4, *supra,* the jury obviously credited Kinnel's testimony and resolved the conflicting testimony in favor of Kinnel. Under our standard of review, no basis exists for reversal of the jury's findings.

### B.

■ Mid–Atlantic also contends that there was insufficient evidence to support the jury's findings on Kinnel's claims against Mid–Atlantic that Mid–Atlantic was guilty of misrepresentations with respect to the St. Anthony's and St. Joseph's contracts.[6] The parties agree that in order to make out a successful claim for misrepresentation under Pennsylvania law, Kinnel had to show: (1) a material misrepresentation; (2) that was intended to deceive; (3) that was made with the intention of induc-

---

**6.** As a threshold matter, we are not persuaded by Mid–Atlantic's argument that because the special interrogatories did not require the jury to specifically find each element of a misrepresentation claim, we must overturn the jury's findings on these counts, III through VI. While the interrogatories did not spell out the five elements of a misrepresentation cause of action, the court's charge to the jury included each of those elements and clearly instructed the jury that it was required to find the presence of each element in order to find misrepresentation. (A1731). Moreover, no objection to either the charge or the interrogatories appears in the record.

ing reliance; (4) that was justifiably relied upon; (5) and that resulted in damage to Kinnel. *See Scaife Company v. Rockwell–Standard Corporation,* 446 Pa. 280, 285 A.2d 451, 454 (1971).

As with the breach of contract claims, there was sufficient evidence before the jury to support its findings of misrepresentation. (See Interrogatories 2.C.(3) and (4), note 4 *supra* ).[7] With regard to the St. Joseph's project Kinnel testified that Kennan had represented to him that the commission rate called for in the contract was 14%. In fact, the contract called for a commission rate of 18%. (A267–69). Kinnel eventually chose not to engage in sales for this project because he felt the 14% commission rate would not justify his efforts. (A267–68). He also testified that had he been told that the commission rate was 18%, "I would have tried to negotiate it higher if I was involved in the negotiation, to the 25 per cent or that range. At 18, I would probably have taken it and I would have had to pay the salesman less." (A269–70).

Similarly, with respect to the St. Anthony's project, Kinnel testified that Kennan represented to him that the contract called for an 18% commission rate. As a consequence, Kinnel accepted a commission rate of 16%. In fact, the contract provided for a two-tiered commission structure, whereby initial units that were sold resulted in a 27% commission up to a cut off point. It was only those units that were sold at a later time, that paid a lower commission of 18%. (A281–83). Kinnel further testified that had he known the actual terms of the contract he would not have accepted the project as offered by Kennan. (A283–84).

We are satisfied that despite Kennan's arguments to the contrary, Kinnel's evidence and the inferences that could be drawn from that evidence, provide a sufficient basis for the jury's verdict that Mid–Atlantic intentionally made material misrepresentations regarding the commission rates to Kinnel and that Kinnel suffered damage by his reasonable reliance upon those misrepresentations.

### III.

We turn now to the more significant arguments raised by Kennan.[8] The first of these arguments focuses on the judgment entered against Kennan individually. Despite the fact that the interrogatories submitted to the jury at the close of the initial trial on liability included no interrogatory involving Kennan's individual liability, (see note 4 *supra* ), the district court on May 5, 1987, entered judgment for liability against both Kennan individually and Mid–Atlantic. Kennan and Mid–Atlantic moved to vacate the judgment, urging as one of the grounds that judgment had been improperly entered against Kennan individually, contrary to the jury's findings. (A158).

### A.

The district court apparently did not rule on the motions which were made after the liability judgment had been entered. Rather, trial was scheduled for determination of the damages. After a two day trial, on May 15, 1987, the jury found damages against Mid–Atlantic and Kennan. The district court's judgment reflecting the damage awards against both defendants was entered on May 18, 1987. It was then that the defendants renewed their motions for judgment n.o.v. or for a new trial claiming among other things that as to Kennan, no damages could be found because the jury had made no finding that Kennan was indi-

---

**7.** On appeal, Mid–Atlantic argues that the sufficiency of the evidence must be viewed by incorporating the Pennsylvania burden of proof for fraud actions. Pennsylvania law requires clear, precise and convincing evidence in ·order to prove fraud. *Snell v. State Examining Board,* 490 Pa. 277, 416 A.2d 468, 470 (1980) (citing *Carlson v. Sherwood,* 416 Pa. 286, 287, 206 A.2d 19, 20 (1965)).

However, Kennan and Mid–Atlantic did not raise this issue when they argued for a directed verdict at the close of Kinnel's case. Furthermore, they did not request the district court to instruct the jury on this standard, nor did they object to the liability charge given by the court which omitted a "clear and convincing proof" instruction.

**8.** Our standard of review for the remaining arguments is plenary.

vidually liable. The district court denied this motion reasoning:

"A district court may, within its sound discretion, amend a special verdict after it is rendered to make it conform to the jury's obvious but unexpressed intention." *Aquachem Company, Inc. v. Olin Corporation,* 699 F.2d 516, 520 (11th Cir.1983). In the case *sub judice,* Kennan testified that he was the founder of Mid–Atlantic Mausoleums and took full responsibility for the company.... While the special verdict interrogatories after the liability portion of the trial listed only Mid–Atlantic as the defendant, we find that it was the jury's obvious, yet unexpressed, intention to consider "Mid–Atlantic," to refer to both Kennan and Mid–Atlantic, especially in view of the damage award against both defendants.... Moreover, we note that at the interrogatories at issue were prepared by defendants and edited and modified by plaintiff. It was this set of interrogatories, agreed to by all parties, which the court submitted to the jury. We, therefore, deny the motion of the defendants to vacate the judgment, or in the alternative to amend the judgment on the liability issue.

(A158–59).

### 1.

 Kinnel in an effort to support the district court's decision, argues that the district court's ruling is permitted by, and consistent with, Fed.R.Civ.P. 49(a). That Rule asserts Kinnel, allows the district court to make a finding—in this case, that Kennan was individually liable—in accord with the jury's special verdict against Mid–Atlantic.

Rule 49(a) provides that if, when submitting special interrogatories to the jury,

the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. *As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.*

(emphasis added).

Kinnel also relies upon *Gallick v. Baltimore and Ohio Railroad Company,* 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963), where the Supreme Court in reviewing a judgment rendered by a state court pursuant to Ohio's special verdict statute, dealt with inconsistencies in the jury's answers to interrogatories by saying:

[I]t is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them: "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atlantic and Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364 [82 S.Ct. 780, 786, 7 L.Ed. 2d 798] (1962). We, therefore, must attempt to reconcile the jury's findings, by exegesis if necessary, ... before we are free to disregard the jury's special verdict and remand the case for a new trial.

*Gallick,* 372 U.S. at 119, 83 S.Ct. at 666.

Initially, we observe that *Gallick* did not involve any analysis of Federal Rule of Civil Procedure 49, the rule on which Kinnel relies here. Moreover, *Gallick* was concerned with inconsistent interrogatories and answers rather than omitted findings. But even without regard to those distinctions, neither *Gallick* nor Rule 49 support Kinnel's position.

Rule 49(a) as we understand it, was designed to have the court supply an omitted subsidiary finding which would complete the jury's determination or verdict. For example, although we recognize that in this case no individual elements of a misrepresentation cause of action were specifically framed for the jury to answer, nevertheless, the district court could "fill in" those subsidiary elements when the jury returned a verdict finding that Mid–Atlantic had misrepresented commission rates to Kinnel. Subsumed within that ultimate jury finding were the five elements of misrepresentation, i.e. materiality, deception,

intent, reasonable reliance and damages, each of which could be deemed to have been supplied by the court in accordance with the jury's judgment once the jury's ultimate verdict was known.

That procedure of supplying a finding subsidiary to the ultimate verdict is a far cry, however, from a procedure whereby the court in the absence of a jury verdict, determines the ultimate liability of a party, as it did here. We have been directed to no authority which would permit the district court to act as it did here in depriving Kennan of his right to a jury verdict.[9]

### 2.

Kinnel argues that the district court, and thus the jury, used the term Mid–Atlantic as "shorthand" for both "Mid–Atlantic and Kennan," and that in returning a verdict against Mid–Atlantic, the jury thought it was returning a verdict against Kennan as well. In support of this contention, Kinnel notes that the district court's charge to the jury referred not to just one defendant, but to "the defendants."

Kinnel's position is not well taken. The court's instructions do not mention Kennan's individual liability at all.[10] In fact, Kennan's name appears only twice in the court's instructions and then only in connection with Mid–Atlantic's and Kennan's

counterclaim against Kinnel. Moreover, the district court's reference to "defendants" is itself a questionable and loose use of the plural, as evidenced by the fact that the district court employed that term in charging the jury on the breach of contract counts. Counts I and II charged only Mid–Atlantic with breach of contract. No relief was sought against Kennan individually on those counts.

### 3.

We previously addressed a somewhat similar issue of an "omitted" verdict, in *Stradley v. Cortez*, 518 F.2d 488 (3d Cir. 1975). In *Stradley*, although the complaint named both Frederick Cortez Sr. and Frederick Cortez Jr. as defendants, the jury only found against Cortez Junior. The colloquy between the jury foreman and the deputy clerk revealed the following:

THE DEPUTY CLERK: Have you agreed upon a verdict?

THE FOREMAN: Yes, we have.

THE DEPUTY CLERK: How do you find? In favor of the plaintiff or in favor of the defendant?

THE FOREMAN: In favor of the plaintiff.

THE DEPUTY CLERK: And what amount do you assess damages?

THE FOREMAN: $150,000

in light of *Stradley v. Cortez*, 518 F.2d 488, 495 (3d Cir.1975), discussed in text, *infra*. We stated in *Stradley* that "[w]e cannot, at this late stage, overturn what appears to be a verdict consistent with the evidence presented on plaintiff's mere allegation that the jury intended to do other than it did when it returned a verdict solely against Cortez, Jr. [here, Mid–Atlantic]." *Id.*

10. Under Pennsylvania law, the court may impose liability on an individual as an actor rather than as an owner. *Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 470 A.2d 86, 90 (1983) (Hutchinson, J.). Thus, a corporate officer is liable for wrongful acts taken by the corporation if "the record establishes the individual's participation in the tortious activity." *Id.* Though it is apparent from the record that there was ample evidence for the jury to make such a finding, the instructions did not address this issue nor was the jury charged to this effect. Thus, the jury was not asked to make such a finding, nor did it. The record discloses no request for a "participation" charge and more significantly, no objection to the charge as given, was made.

---

9. In rejecting Kinnel's argument that the district court could supply its own "finding" that Kennan was individually liable, we also reject Kinnel's argument that the district court, in effect, *made* such a finding in accordance with Fed.R. Civ.P. 49(a), when it entered judgment against Kennan as well as Mid–Atlantic. The district court relied on *Aquachem Co., Inc. v. Olin*, 699 F.2d 516 (11th Cir.1983), to support its finding "that it was the jury's obvious, yet unexpressed intention to consider 'Mid–Atlantic' to refer to both Kennan and Mid–Atlantic." (A158). We have quoted the district court's reasoning in text, *supra*, typescript at 965.

First, we have difficulty in construing the district court's reliance on a jury's unexpressed intention as a "finding," let alone a finding within the meaning of Rule 49(a). Second, the court in *Aquachem* did not rely upon Rule 49(a), cited no authority for the proposition upon which the district court here depended, and that proposition in any event, constituted only dictum. In addition, *Aquachem* would appear to be questionable authority in this circuit

THE DEPUTY CLERK: Members of the jury, hearken unto your verdict as the Court hath recorded it: In this issue joined wherein S. Kenneth Stradley is plaintiff and Frederick Cortez, Jr. is defendant, you find for the plaintiff $150,000 and so say you all?

THE JURY: Yes.

A judgment was thereupon entered in favor of the plaintiff and against Cortez Junior.

Some four years later, the plaintiff, Stradley moved, pursuant to Fed.R.Civ.P. 60(b) to amend the docket sheet and to have judgment entered against Cortez Senior as well. The district court denied Stradley's motion, holding that:

> We do not believe that the Court has the authority to amend the docket entries so that judgment may be entered against a defendant whom the jury had not stated in their verdict ... [citation omitted]. We cannot now enter the minds of the jurors to answer a question that was never posed to them....

*Id.* at 490. On appeal, we stated our agreement with the district court's reasoning. *Id.* [11]

### 4.

Kinnel also argues that because the interrogatories submitted to the jury had been prepared by counsel for Mid–Atlantic and Kennan and only referred to "defendant Mid–Atlantic", Kennan should not be permitted to take advantage of the jury's failure to return a finding against him. Indeed, Kinnel charges that "Kennan's counsel attempted to affirmatively keep the issue of Kennan's liability from the jury by framing the special interrogatories in such a way as to avoid mention of the individual defendant." Brief of Appellee at 18.

The difficulty with Kinnel's argument is that while the defendants may have prepared the interrogatories, the interrogatories were edited and modified by counsel for Kinnel. As the district court stated in its opinion denying the defendants' motion to vacate the judgment "[i]t was this set of interrogatories agreed to by all parties, which the court submitted to the jury." (A159).

Moreover, subsequent to the submission of these interrogatories to the jury (a submission which took place directly after the liability instructions given to the jury on April 30, 1987) no objection was taken to the form or content of the interrogatories which omitted reference to Kennan individually. Kinnel's counsel did raise questions as to some aspects of the interrogatories, and as to those, the district court issued corrective instructions. No correction, however, was ever asked with respect to the omission of Kennan from the interrogatories.

We recognize that some two weeks later, Kinnel's counsel sought to correct the form of the liability interrogatories. This attempted correction came at the point in time when the district court was submitting the damage interrogatories to the jury after the conclusion of the trial on damages. The district court did not specifically rule on this offer but, by the same token, it did not resubmit these delayed liability interrogatories to the jury.

Even if we were to regard this belated offer as a motion which was denied and then preserved as a point of appeal, which it was not, we could not say that the district court improperly exercised its discretion in declining to have the "damage jury" reconsider liability determinations. This is especially true where the attempted correction occurred some two weeks after the conclusion of the liability phase of the trial, and where no instructions relating to the proposed revised interrogatories, i.e. Kennan's individual liability, had ever been given.[12]

---

11. The district court in *Stradley*, however, *sua sponte* awarded the plaintiff, Stradley, a new trial. We reversed that decision, holding that the district court abused its discretion in granting a new trial under Fed.R.Civ.P. 59.

12. Kinnel also argues that it was proper for the district court to enter judgment against Kennan on liability, given that the jury later found damages against Kennan. We cannot agree that in the context of this case a finding of damages can precede a determination of liability or that one can be inferred from the other. See 9C.

968

### 5.

Thus, we are satisfied that the district court erred in entering a judgment against Kennan individually. If that error constituted the only error appealed, we would do no more than reverse, and direct the district court to vacate the judgment against Kennan. However, Kennan and Mid–Atlantic have also questioned the judgment entered after the damage trial, claiming that a new trial on damages is required because of errors committed by the district court in its instructions on damages.

### IV.

■ Mid–Atlantic contends that a new trial on damages is required because the district court erred in its damage instructions to the jury and did not properly frame the damage interrogatories. Mid–Atlantic argues that the district court did not distinguish between the contract causes of action and the misrepresentation causes of action.

This distinction is vital because under Pennsylvania law a breach of contract cannot result in punitive damages even though it may result in compensatory damages. Indeed, the Pennsylvania decision cited by Mid–Atlantic when it submitted its request for charge on this issue holds that even when the breach was "solely motivated by a malicious intent to cause harm to [the] plaintiff [punitive damages will] not be assessed for a breach of mere contractual duties." *Daniel Adams Associates, Inc. v. Rimbach Publishing Inc.*, 287 Pa.Super. 74, 77, 429 A.2d 726, 728 (1981) *See also*

Wright and A. Miller, Federal Practice and Procedure, § 2390 at 296 (1971) ("[L]ogically liability must be resolved before damages are considered.")

**13.** INTERROGATORIES

1. What damages, if any, do you award the plaintiff on the St. Joseph's project:

Against Mid–Atlantic Mausoleums, Inc.
Compensatory *$105,000* Punitive *$20,000*
Against John E. Keegan
Compensatory *$5,000* Punitive *$1.00*

2. What damages, if any, do you award the plaintiff on the St. Anthony's project:

Against Mid–Atlantic Mausoleums, Inc.
Compensatory *$169,000* Punitive *$30,000*

*Franklin Music v. American Broadcasting Co.*, 616 F.2d 528, 542 (3d Cir.1979) (Pennsylvania does not permit punitive damages for the breach of contractual duties); *Rittenhouse Regency Affiliates v. Passen*, 333 Pa.Super. 613, 615, 482 A.2d 1042, 1043 (1984); *Reliance Universal, Inc. of Ohio v. Ernest Renda Contracting Co.*, 308 Pa.Super. 98, 107, 454 A.2d 39, 44 (1982); *DeLuca v. Fidelity Bank*, 282 Pa. Super. 365, 368, 422 A.2d 1159, 1161 (1980).

Despite this established principle, the district court, though it charged on both punitive and compensatory damages, failed to instruct the jury that it could only return punitive damages on the misrepresentation causes of action and that it could not find punitive damages with respect to breach of contract causes of action. The error was compounded by the form of the interrogatories given to the jury for their damage verdicts. The damage interrogatories, the answered version of which we set out below, demonstrates the flaws in the damage findings, and thus in the damage judgment.[13]

It is readily apparent that although Kinnel charged Mid–Atlantic with a breach of contract as to finder's fees as well as with misrepresentations as to the rate of sales commissions, it cannot be discerned from the jury's lump sum damage verdict whether punitive damages were assessed by the jury with respect to contract breaches or with respect only to the misrepresentation counts. This result is not surprising, since the instructions to the jury did not warn the jury of this critical distinction.[14]

Against John E. Keenan
Compensatory *$10,000* Punitive *$10,000*

**14.** An example of the court's charge which failed to distinguish between the damages which could be awarded for the contract and tort claims reads, as follows:

In addition to actual damages, the law permits you, the jury, under certain circumstances, to award the injured person punitive and exemplary damages, in order to punish the wrongdoer for some extraordinary misconduct, and to serve as an example or warning to others not to engage in such conduct.

If you should find from a preponderance of the evidence in the case that the plaintiff is entitled to a verdict for actual or compensatory damages; and should further find that the

The ambiguity in the jury's verdict which necessarily resulted from the district court's instructions [15] and the form of the special interrogatories which the jury was required to answer so flaws the judgment for damages against Mid–Atlantic that we are obliged to order a new trial on damages only.[16]

## V.

Because we hold that the district court erred in entering judgment against Kennan, and because we hold that the charge to the jury on damages, as well as the format of the damage interrogatories were fatally flawed, we will: 1) affirm so much of the district court's order entering judgment in favor of Kinnel and against Mid–Atlantic with respect to the St. Anthony's and St. Joseph's projects; 2) vacate the judgment for damages entered on May 18, 1987 in favor of Kinnel and against Mid–Atlantic and remand with the direction that a new trial on damages be conducted consistent with the foregoing opinion; and 3) direct the district court to vacate all liability and damage judgments previously entered in favor of Kinnel against John E. Kennan individually.

---

15. Moreover, the district court's charge required the jury to return a "lump sum" award for each category of damages. The charge read, "What we want is a lump sum amount in these areas, if any. If you think there is no money to be act of omission of the defendant, which proximately caused actual injury or damage to the plaintiff, was maliciously or wantonly, or oppressively done; then you may, if in the exercise of discretion you unanimously choose so to do, add to the award of actual damages such amount as you shall unanimously agree to be proper, as punitive and exemplary damages.

16. We do not address the damage judgments returned against Kennan individually because we have previously determined that no damage judgment should have been entered against Kennan. awarded, you put a zero in each of the categories. Just because they are here does not mean you have to award it, but if you do award it, it must be a lump sum." (A13A). This "lumping" together of the compensatory damages has made it difficult, if not impossible, to review the claim made by Mid–Atlantic that Kinnel suffered no damage on the St. Anthony's project because that project was never built.