**In re TM CARLTON HOUSE PARTNERS, INC., Debtor.**

**Bankruptcy No. 88–10774S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 15, 1989.

Martin J. Weis, Lawrence G. McMichael, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for debtor.

Tom P. Monteverde, Jean C. Hemphill, Philadelphia, Pa., for claimant.

Mark J. Packel, Robert H. Levin, Adelman, Lavine, Gold & Levin, Philadelphia, Pa., for Creditors' Committee.

ADJUDICATION

DAVID A. SCHOLL, Bankruptcy Judge.

A. FINDINGS OF FACT

1. The instant contested matter involves an Objection by the Debtor-in-Possession in this bankruptcy case, TM CARLTON HOUSE PARTNERS, INC. (hereinafter referred to as "the Debtor"),[1] filed on June 20, 1989, to a Proof of Claim (No. 71) in the amount of $497,500, timely filed on March 27, 1989, on behalf of the Claimant, EDWARD CANTOR & CO. (hereinafter referred to as "the Claimant").

2. The matter was heard on a must-be-tried basis in a lengthy proceeding on November 15, 1989. At the close of testimony, the court accorded the parties each until December 1, 1989, to file proposed Findings of Fact, proposed Conclusions of Law, and Briefs supporting their respective positions.[2]

3. The principals of the Claimant are Edward Cantor (hereinafter "Edward") and Ronald Cantor, who are a father and son, respectively, who have at least 20 years experience as real estate brokers specializing in the purchase and sale of buildings in the Philadelphia area.

4. In 1983, a group represented by Edward signed an agreement to purchase the Debtor's realty, a large commercial, retail, and residential apartment building covering an entire block in Center City, Philadelphia, Pennsylvania (hereinafter "the Building"), subject to certain contingencies, but this transaction was not consummated.

5. Shortly thereafter, in the latter part of 1983 and the early months of 1984, Edward introduced John G. Berg (hereinafter "Berg") to Steven M. Mullins (hereinafter "Mullins"). At the time Berg was President of a corporation which managed and purported to be the owner of various apartment buildings or apartment complexes in the Philadelphia area, including the Building in issue and Fairmount Terrace Apartments (hereinafter "Fairmount"). Mullins was one of the two general partners (the other being Glenn S. Morris) of General American Equities (hereinafter "GAE"), an Illinois general partnership similarly engaged in various real estate ventures. On February 21, 1984, at a meeting in Berg's office in Philadelphia, Edward claimed that Berg and Mullins orally agreed to share between them the payment of a $100,000 commission to the Claimant for its services in bringing these parties together in connection with a prospective sale of Fairmount to Mullins or one of his affiliates. However, the proposed sale of Fairmount fell through.

6. On or about March 7, 1984, Edward arranged a further meeting between Berg and Mullins which took place at GAE's offices in Chicago. At that time, Berg and Mullins discussed possible sales or transfers of various properties owned by each of them to the other, including the Building. Edward claimed that, at that meeting, Berg and Mullins orally agreed that, in the event a transaction involving the Building were concluded between them or their affiliates, they would jointly and severally pay the Claimant a commission of $500,000, which was one (1%) percent of the face amount of the transaction ($50 million). The claim in issue is based on this oral contract; the Claimant maintains that the later, written contracts by which Berg alone promised to pay its commission are not reflective of the parties' actual contract and were concocted solely for tax purposes or other purposes.

7. However, Berg, who was called by the Claimant as its witness at the hearing on November 15, 1989, testified that he understood at all times that, as a result of the exchange on March 7, 1984, he alone,

---

**1.** For a history of the proceedings in this case generally, the reader is referred to our previous Opinions reported as *In re TM Carlton House Partners, Ltd.*, 93 B.R. 859, 861–62; and 91 B.R. 349, 351–53 (Bankr.E.D.Pa.1988). A Plan of Reorganization was ultimately confirmed in this case on May 31, 1989.

**2.** On December 11, 1989, the Claimant improperly sought to embellish the record by submitted a Response to the Debtor's submission. *See In re Jungkurth*, 74 B.R. 323, 326 (Bankr.E.D.Pa. 1987), *aff'd*, 87 B.R. 333 (E.D.Pa.1988). The Debtor moved to strike this remittance. In light of our disposition in favor of the Debtor, this motion appears to be moot.

as seller, was obliged to pay the commission to the Claimant. Mullins did not testify at the hearing, although Thomas Cooney, who began serving as a consultant of GAE in 1983 and became its chief operating officer as of May, 1984, did testify and denied that there was any agreement on the part of Mullins or GAE to pay a commission to the Claimant in reference to the sale.

8. The Claimant provided no further substantial services in connection with this sale, although Edward kept a record of numerous contacts with Berg and Mullins thereafter, the substance of which were not explained except by reference to the homes of the parties, through the end of 1985.[3] As of March 7, 1984, the terms discussed in negotiations had not been very specific, as Edward did not disclose at this meeting the accurate identity of the owner of the Building, which was not Berg personally, nor that Berg was a convicted felon, nor were any definite terms or even the specific parties to the transactions discussed.

9. Although Edward testified that he usually remained involved as a go-between in transactions where the Claimant receives a fee as a "broker" or a "finder," he noted that he did not do so in this transaction because Berg and Mullins insisted on carrying on their negotiations directly.

10. Shortly after correspondence of late September, 1984, between the Claimant and Berg, wherein the Claimant indicated that it was aware that the Building was about to be sold and inquired about the arrangements for paying its commission, Berg forwarded an Agreement of Sale of the Building dated September 25, 1984, to the Claimant. The parties to this sale were Arco Management Corp., apparently a Berg-controlled entity, as seller, and GAE, as buyer. The Agreement stated, with respect to brokerage fees, that Middle States Realty Co. (hereinafter "MSRC"), an entity controlled by Mullins, was the sole broker receiving commissions in the transaction.

11. Ultimately, however, an Amended and Restated Agreement of Sale, also dated September 25, 1984, to which the parties were Berg and his wife, as sellers, and GAE, as buyer, was prepared. This document provided that the *"Seller* [sic] agrees to pay a real estate commission to [MSRC] ... and a Consulting Fee Agreement to [the Claimant]" (emphasis added), which Agreement was allegedly attached to the Agreement of Sale, but was not actually affixed to the copy produced at trial.

12. Pursuant to apparently the Amended Agreement of Sale, a closing of the sale of the Building took place on or about October 31, 1984. No representative of the Claimant was present at the closing. There is no evidence that the Claimant was notified of or otherwise given the opportunity of attending the closing, although there is also no indication that any representative of the Claimant asked to do so.

13. On or about December 13, 1984, Berg sent the Claimant a document entitled "Consultation Fee Agreement," dated November 1, 1984, between the Claimant and Berg alone. This document recited that "Seller has heretofore agreed to pay Consultant a fee in connection with such services," and that the fee provided for contemplated Berg's payment of $548,750 (the agreed fee, plus, apparently, consideration for the delay in payment) in ten semi-annual installments, commencing May 31, 1985, and concluding April 30, 1990. The document also provided as follows:

> If the Purchaser defaults under the Purchase Agreement or any financing provided by Seller incident thereto, all of Seller's obligations under this Agreement shall be terminated, subject to reinstatement in the event the Purchaser cures its default, in which event any payment that would have been due under this Agreement during the period of such default shall be paid by Seller to Consultant.

The Claimant, at this juncture, is not making a claim under this document, because

---

**3.** These contracts could possibly relate to other transactions between Berg and Mullins in which the Claimant believes that it is entitled to a commission. *See* Finding of Fact 19, page 516 *infra.*

the only obligor under it is Berg, not the Debtor.

14. The Claimant executed and returned the Consultation Fee Agreement, as drafted, to Berg's attorneys on January 8, 1985, after being advised that specific provisions for the payment of its fee would be included in an Escrow Agreement pursuant to which Berg and GAE had closed the Sale of the Building.

15. The Escrow Agreement, dated October 31, 1984, included an Exhibit containing a distribution schedule: payments first to Skokie Federal Savings and Loan Association, the second mortgage lender in the transaction; then to MSRC; then to the Claimant "pursuant to the Cantor Agreement described in Background paragraph K above." Background paragraph K provides, in pertinent part, as follows:

> *Berg* and [the Claimant] have entered into a consulting agreement with respect to the Property ... pursuant to which *Berg* has agreed to pay certain consulting fees to [the Claimant] (emphasis added).

16. On May 8, 1985, the Escrow Agent under the Escrow Agreement, Philadelphia National Bank, transferred $51,250 to the Claimant. However, the Claimant has received no payments since, and its present claim is for the balance of those payments due, *i.e.,* $497,500.

17. Thereafter, there was correspondence between the Claimant and, initially, Berg, and, subsequently, Mullins and Cooney, in which the Claimant requested payment of the balance of its fee.

18. As Berg testified at the hearing of November 15, 1989, it is his belief that GAE and/or Mullins and his associates defaulted on the terms of the Agreement of Sale by, *inter alia,* diverting payments to MSRC, making unauthorized additional loans in connection with this transaction, and otherwise misusing funds. It is his theory (he is an attorney) [4] that the Claimant's cause of action against the Debtor should be based not upon any contract

which it claims that it had with the Debtor and its predecessors, as he believed that there was no contract between the Claimant and any party to the sale other than him, but upon the Debtor's "tortious interference" with the Claimant's business relationship with him, which was manifested by the Debtor's violation of the terms of the Purchase Agreement, thereby, according to him, exonerating him from his performance under the Consultation Fee Agreement (*see* the paragraph quoted at Finding of Fact 13, page 515 *supra*) by its wrongful acts.

19. The Claimant filed a suit in the Court of Common Pleas of Philadelphia County against, *inter alia,* the Bergs; Mullins and Morris, individually and trading as GAE; and Mullins, Morris and GAE, individually and trading as the Debtor. The Complaint alleges that the Claimant is due commissions on the foregoing transaction and, in addition, on a second transaction in which a Berg-controlled entity sold another property to a Mullins-controlled entity, and on a third transaction in which a Mullins-controlled entity sold a property to a Berg-controlled entity. The Claimant has not been paid commissions which it claims are due to it as a result of any of these contracts.

20. Preliminary Objections to the Complaint were sustained in part on March 10, 1988, three days after this bankruptcy case was commenced by the filing of an involuntary petition against the Debtor, but the Claimant was allowed to file a more specific Complaint within thirty (30) days thereafter. The Claimant has, however, chosen not to pursue this action against any of the non-debtor parties and to delay the filing of the more specific complaint unless and until it (the Claimant) applied for and secured relief from the automatic stay in this bankruptcy case or determined that it wished to pursue its claims against the remaining defendants.

21. The claim stated in the present form of the Complaint regarding the Building transaction, in direct contrast to the

---

**4.** He is, as was mentioned in Finding of Fact 8, page 515 *supra,* also a convicted felon and the principal of the Debtor involved in a separate

Chapter 11 case before us, *In re John G. Berg Associates, Inc.,* Bankr. No. 89–12337S.

present claim of the Claimant, alleges only a violation of the Consultation Fee Agreement. No precise legal theory upon which the Claimant would have a cause of action against the Debtor under that Agreement is alleged in the Complaint, presumably triggering the granting of the Preliminary Objections. The Claimant now bases its claim on, alternatively, a contract of the Debtor to pay it as a result of the meeting of Edward, Berg, and Mullins on March 7, 1984, and pursuant to its alleged status as a third-party beneficiary of the Amended Agreement of Sale and/or the Escrow Agreement between the Berg-controlled entities and the Mullins-controlled entities, neither of which theories are recited in the Complaint.

22. On May 31, 1989, this Court confirmed the Debtor's Plan of Reorganization. Pursuant to the terms thereof, Berg and the general partners of the Debtor exchanged mutual releases of all claims against the other(s) with respect to the transaction in which the Debtor acquired the Building.

## B. CONCLUSIONS OF LAW

1. This court has jurisdiction over and is obliged to hear and determine this contested matter, as it involves the allowance or disallowance of a claim. 28 U.S.C. §§ 157(b)(1), (b)(2)(B), 1334(b).

■ 2. Although the Debtor has the burden of producing evidence to rebut the *prima facie* validity of the Claimant's proof of claim, if it does so, the ultimate burden of proof or persuasion of the allowability of his claim is upon the Claimant. *See, e.g., In re Franks,* 95 B.R. 346, 350 (Bankr.E.D.Pa.1989); *In re Jordan,* 91 B.R. 673, 676, 682–84 (Bankr.E.D.Pa.1988); *In re Celona,* 90 B.R. 104, 109 (Bankr.E.D. Pa.1988), *aff'd sub nom. Celona v. Equitable National Bank,* 98 B.R. 705 (E.D. Pa.1989); and *In re Lewis,* 80 B.R. 39, 40–41 (Bankr.E.D.Pa.1987).

The Debtor did produce evidence which would, if accepted by us, invalidate the Claimant's entire proof of claim. The burden of proof of the validity of its claim was therefore squarely upon the Claimant. *Compare Franks, supra,* 95 B.R. at 350.

3. *The Claimant has failed to meet its burden of proving, by a preponderance of the evidence, that the Debtor (as opposed to Berg) contracted with it to pay it a finder's fee.*

■ We acknowledge that a party may be engaged as a "finder" of a buyer or a seller of realty on the basis of an oral contract and that the finder's only engagement is "that of a middleman who introduces the parties, supplies information to one or both about the other and is required to do little else, ..." *Amerofina, Inc. v. U.S. Industries, Inc.,* 232 Pa.Super. 394, 399, 335 A.2d 448, 451 (1975). *See also, e.g., Kinnel v. Mid–Atlantic Mausoleums, Inc.* 850 F.2d 958, 961–63 (3d Cir.1988); *Sachs v. Continental Oil Co.,* 454 F.Supp. 614, 618 (E.D.Pa.1978); *Modern Tackle Co. v. Bradley Industries, Inc.,* 11 Ill.App.3d 502, 297 N.E.2d 688, 692–93 (1973); and *Annot., Validity, Construction, and Enforcement of Business Opportunities or "Finder's Fee" Contract,* 24 A.L.R.3d 1160, 1165, 1168 (1969). We therefore recognize that the responsibilities of a "finder" in a realty transaction are not as extensive as those of a "broker," and that a "finder," to receive a commission, need not engage in negotiations which lead directly to a sale of the property in reference to which it is engaged, as does a "broker." *See Sachs, supra,* 454 F.Supp. at 618; and *Amerofina, supra,* 232 Pa.Super. at 399–400, 335 A.2d at 451–52. *Compare Christo v. Ramada Inns, Inc.,* 609 F.2d 1058, 1061–62 (3d Cir.1979); and *Axilbund v. McAllister,* 407 Pa. 46, 55–56, 180 A.2d 244, 249 (1962).

Nevertheless, because the alleged finder's contract was oral and there is, consequently, no written declaration of the meeting of the minds of three parties in issue (Berg, Mullins, and Edward), the burden upon the Claimant of proving the definite terms of the contract is heightened. *See Modern Tackle, supra,* 297 N.E.2d at 693 (court finds, despite jury verdict for finder, that the ambiguity of the contract justified a judgment n.o.v. for the defendant); and

Annot., *supra*, 24 A.L.R.3d at 1166–68 (a finder's contract must be clear and definite to support a fee). *Compare Kinnel, supra*, 850 F.2d 960 n. 4 (jury found that an oral contract existed between the parties); and *Amerofina, supra*, 232 Pa.Super., at 396, 400–01, 335 A.2d at 450, 452 (defendant admitted the existence of an oral contract between the parties and jury found a valid finder contract).

The instant Claimant has failed to convince us that a valid oral contract was made between the Claimant and the Debtor (as opposed to Berg) whereby the Debtor agreed to compensate the Claimant for a finder's fee for several reasons. Of the three parties to the transaction, only Edward claims that there was such an agreement. His testimony, moreover, failed to relate any specific exchange of words creating such a contract. It appears that, unfortunately, Edward apparently assumed, because of the circumstances of the parties, that there was such a contract. We believe that, unless expressly articulated, no such agreement can be assumed.

Berg, the Claimant's own witness and a party seemingly sympathetic to and interested in the Claimant's cause as a means of relieving at least part of his own liability, denied his belief that such a contract existed. Mullins did not testify, but Cooney testified on behalf of the Debtor that no such contract existed. There is, moreover, no evidence that Mullins, as one of the general partners of a partnership which purchased the Building and only thereafter formed the Debtor, could bind the Debtor thereto. As of March 7, 1984, the Debtor did not even exist. It was little more than a potential gleam in Mullins' eye. How it could thus be rendered liable for an obligation before its birth (or even its conception) is difficult to fathom.

Moreover, the written documentation, such as it is, rebuts the Claimant's contention that the Debtor (again, as opposed to Berg) is liable to it for its fee, even if we could, as we doubt that we can, consider Mullins, GAE, and the Debtor as a single entity. The Amended Agreement of Sale,

although revised to specifically reflect the Claimant's role in the transaction, recites, consistent with Berg's testimony, that "the *Seller*," *i.e.*, Berg and his entities, agreed to pay the Claimant's commission. The Consultation Fee Agreement, executed by the Claimant, includes only Berg as obligor. The Escrow Agreement recites a third priority of distribution of sales proceeds to the Claimant, but expressly reaffirms that this payment is pursuant to a consulting agreement in which only *Berg* has agreed to fees to the Claimant.

The Claimant's prior pursuit to its legal rights is arguably also inconsistent with its present articulation of its understanding of the finder's fee agreement. The state court lawsuit was expressly based upon the Consultation Fee Agreement. The Debtor's inclusion as a party to that action appears to be merely as a failsafe against omission of any potentially-interested party. No allegation of any legal cause of action against the Debtor is averred. It appears that the Claimant has belatedly and somewhat awkwardly turned to the claims process in this case as a means of collecting its fee because the parties more appropriately targeted, *e.g.*, Berg, or Mullins, are suffering from financial distress and the Debtor's distributions are hence the only readily-available source of at least some payment.

At the close of the hearing of November 15, 1989, we made it clear to the Claimant that we were not convinced that the Debtor had contracted to pay its fee, and that it had better rely on alternative theories. Nevertheless, the Claimant chose not to supplement the legal argument in its Pre-Trial Brief, in which the primary argument was that such a contract between it and the Debtor existed, and a secondary argument was that it was a third-party beneficiary of (unspecified) agreement(s) between the respective entities of Berg and Mullins in the sale of the Building. Instead of supplemental legal arguments, the Claimant, in its proper Post-trial submission,[5] provided us with 29 pages including 56 lengthy pro-

---

**5.** It also remitted an improper post-trial submis-

sion, as we observed at page 514 n. 2 *supra*.

posed Factual Findings, many of which center upon the alleged irregularities of Mullins and his affiliates in the proceedings in which the terms of Agreement of Sale of the Building were allegedly breached by Mullins, *et al.*, but no additional briefing. We will give the Claimant the benefit of our doubt that these proposed findings are articulated not to paint Mullins and his associates as bad, unsympathetic people, but as support for Berg's hypothesis that the Debtor could be liable to the Claimant for "tortious interference" of the contract to pay commissions between Berg and the Claimant. *But see* pages 520–21 *infra.*

4. *As no contracts indicate an intention to provide the Claimant with rights against the Debtor, the claimant's argument that it is· a third-party beneficiary of any such contracts fails.*

■ A necessary component of a claim that a party is a "third-party beneficiary" of a promise contained in a contract between parties which does not include the beneficiary as a contracting party is that a promisor in the contract has obligated itself to undertake a performance which will benefit the third-party beneficiary. The Claimant is understandably vague about what contract included what promise on the part of the Debtor which was to be for its benefit. This is because there is no such contract. The Consultation Fee Agreement clearly includes the Claimant itself as a party and does *not* include the Debtor, thereby rendering baseless any third-party beneficiary claim based upon it. The Amended Agreement of Sale and the Escrow Agreement merely set forth the buyers' cognizance of *Berg's* obligations to the Claimant in the Consultation Fee Agreement. We are therefore at a loss to ascertain what promise the *Debtor* is alleged to have made on behalf of the *Claimant* in any of these contracts.

Even if we could find a contract in which the Debtor (or its predecessors) made any promise to the benefit of the Claimant, the Claimant, to hold the Debtor liable therefor, would be obliged to satisfy the following requirements of 2 RESTATEMENT (SECOND) OF CONTRACTS, § 302, at 439–40 (1981), expressly adopted as the law of Pennsylvania by the Pennsylvania Supreme Court in *Guy v. Liederbach,* 501 Pa. 47, 60, 459 A.2d 744, 751 (1983):

§ 302. Intended and Incidental Beneficiaries

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give each beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Thus, in order to attain rights as a third-party beneficiary of any contract in issue, it was incumbent upon the Claimant to prove that both parties to the Contract intended to benefit it by expressly making promises additional to those to each other on the Claimant's behalf. *See Williams v. Virgin Islands Water & Power Authority,* 672 F.2d 1220, 1228 (3d Cir.1982); and *In re Mirkin,* 100 B.R. 221, 226–27 (Bankr.E. D.Pa.1989). There is no indication that any of the parties to the Amended Agreement of Sale or the Escrow Agreement had any intention of expressly making additional promises to the Claimant on its behalf not already embraced in the Consultation Fee Agreement, which ran between only the Claimant and Berg. The Amended Agreement of Sale and the Escrow Agreement merely reassert and provide specific means for distribution of funds to which the Claimant is entitled under (again, only) the Consultation Fee Agreement. They do not include a promise of any party to join Berg as a promisor of payment to the Claimant.

In making the third-party beneficiary argument, the Claimant relies heavily upon *In re Gebco Investment Corp.*, 641 F.2d 143, 146–49 (3d Cir.1981), in which the Court of Appeals held that subcontractors for which a building owner was holding payments in escrow for a debtor-contractor were entitled to those payments in preference to the debtor's bankruptcy trustee. We recognize the rights of subcontractors to funds which a debtor-contractor has specifically promised to remit to them or an owner has or intends to remit directly to the subcontractors. *See In re Builders Alliance, Inc.*, 100 B.R. 203, 206–07 (Bankr.E.D.Pa.1989); and *In re Temp–Way Corp.*, 82 B.R. 747, 753 (Bankr.E.D.Pa. 1988). However, the facts here are totally inapposite to the facts of those cases. There, the respective contractors were, *by contract*, obligated to pay the respective subcontractors. The subcontractors were hence not asserting rights as third-party beneficiaries. The issue was the priority of the respective subcontractors' clear contractual rights vis-a-vis the rights of the respective debtors' trustees. ·

Consequently, the Claimant here has no possible basis on which he can prevail as a third-party beneficiary of any contract in issue.

5. *The Debtor's alleged breaches of its contracts with Berg do not provide the Claimant with any rights against the Debtor.*

 The only legal theory left to the Claimant to support its claim is Berg's rather vague contention that the Debtor should be liable to it under a claim of "tortious interference" with the Claimant's contract with Berg because, according to Berg, the breach of the Purchase Agreement by the buyers exonerated him from liability under the terms of the Consultation Fee Agreement.

Initially, we note that it is only *intentional and improper* interference of the performance of a contract which is an actionable tort. *See Sachs, supra,* 454

F.Supp. at 620; and 4 RESTATEMENT (SECOND) OF TORTS, §§ 766, 766A, at 7, 12, 17, 19 (1979). *Negligent* interference with contractual relations is not actionable. *Id.,* § 766C, at 23–24. Thus, the Claimant could prevail on a "tortious interference" theory only by proving that (1) the Debtor breached a contract with Berg; and (2) this breach was motivated principally by the Debtor's desire to destroy the Claimant's cause of action against Berg.

Neither of these elements has, in fact, been proven. Firstly, we believe that Berg's testimony that the sellers were guilty of unilateral contractual violations to his detriment are placed in doubt by the mutual releases of the Debtor and Berg from liability to the other in the Building-sale transaction. It is also unclear that the Debtor, as opposed to Mullins, or Morris, or GAE, was perceived by Berg as the wrongdoer to him. Secondly, there is no indication that any acts by the Debtor, or Mullins, *et al.*, assuming *arguendo* they were wrongful, were done for the "primary purpose of interfering with the performance" of the Claimant's contract with Berg. *Id.* at Comment *j* to § 766, at 12. A very similar argument, in the context of an action seeking, like here, the collection of a finder's fee, was summarily rejected in *Sachs, supra,* 454 F.Supp. at 620.

Without expressly so stating, a theory of "tortious interference" along the lines suggested by Berg is the most charitable motivation which we can attribute to the Claimant's recitation of a large body of proposed factual findings concerning alleged fiscal improprieties by the buyers of the Building, as we mentioned at page 519 *supra.* The theory, proffered in a vague way, seems to be that, if Berg is not responsible for breach of the Consultation Fee Agreement because of the condition exonerating him if the deal outlined in the Agreement of Sale fell through, the Debtor, as the party responsible for the deal's failure, should be.

We recognize that a promisor is not responsible to his promisee for failure to

satisfy a contract condition which the promisee prevents him from fulfilling. *See Rainier v. Champion Container Corp.,* 294 F.2d 96, 103 (3d Cir.1961); and *In re Frymire,* 96 B.R. 525, 540 (Bankr.E.D.Pa. 1989), *aff'd in part and vacated in part sub nom. Frymire v. Painewebber, Inc.,* 107 B.R. 506 (E.D.Pa.1989). However, here, the Claimant is not a party to the contract which the Debtor-promisor has allegedly breached. The Claimant thus lacks privity with the Debtor to stand in the shoes of Berg as promisee and raise this contention against the Debtor-promisor. *Cf. In re DSC Industries, Inc.,* 79 B.R. 244, 248 (Bankr.E.D.Pa.1987), *aff'd in part and remanded in part,* 94 B.R. 42 (E.D. Pa.1988). Furthermore, even if the Claimant *were* entitled to stand in Berg's shoes, its rights would rise no higher than those of Berg. *See In re Silver,* 26 B.R. 526, 530 (Bankr.E.D.Pa.1983). Berg's claims against the Debtor have been wiped out by the parties' mutual releases. Therefore, any contention of the Claimant on this basis is similarly wiped out.

6. The Claimant has failed to satisfy its burden of proving the legitimacy of its proof of claim by the requisite "preponderance of the evidence" standard. Accordingly, its proof of claim must be stricken in its entirety.[6]

## C. ORDER

AND NOW, this 15th day of December, 1989, after a lengthy hearing of November 15, 1989, on the Debtor's Objection to the Proof of Claim of EDWARD CANTOR & CO. (No. 71) and upon consideration of the pre-hearing and post-hearing Briefs and the post-hearing proposed Findings of Fact and Conclusions of Law submitted by the parties, it is hereby

ORDERED that the Objection is SUSTAINED and this Claim is STRICKEN in its entirety.

---

**6.** The Debtor argues, in the alternative, that, even if we allowed the claim, we would be obliged to reduce it because the services performed by the Claimant, amounting mostly to arrangement and attendance at one meeting, did not justify the fee of $500,000 demanded. We note that a "finder," if employed post-petition, would be a professional person who could be compensated only if appointed by the bankruptcy court. *Compare In re Schwemmer Hardware, Inc.,* 103 B.R. 635, 638–39 (Bankr.E.D.Pa. 1989) (auctioneer is a professional person); and *In re 31–33 Corp.,* 100 B.R. 744, 746–47 (Bankr. E.D.Pa.1989) (real estate broker is a professional person). *But see In re Yobe,* 74 B.R. 430, 434 (Bankr.W.D.Pa.1987) (court expresses disinclination to appoint a "finder" as a professional person). However, a professional person's unsecured claim for pre-petition services is not subject to quite so strict security as a claim of a post-petition professional person appointed by the court, who is entitled to assert administrative-claim status. *See In re George Worthington Co.,* 76 B.R. 605, 607 (Bankr.N.D.Ohio 1987). A claim for fees by the debtor's own pre-petition professional should also not be scrutinized quite so strictly as that of a claim by a professional hired by a creditor. *Compare, e.g., In re Vitelli,* 93 B.R. 889, 900–01 (Bankr.E.D.Pa.1988). Furthermore, a fee application of a professional person who is to be compensated for services under a commission based upon a percentage of proceeds realized is not required to submit as detailed an application for compensation as a professional who is to be compensated for services on an hourly basis, such as an attorney or an accountant. *See Schwemmer Hardware,* 103 B.R. at 639–40. However, we do believe that some measure of review of a pre-petition unsecured claim of a professional person is required, particularly in response to an objection thereto, and an unconscionable fee request in comparison to the services actually provided is subject to reduction by the court. *See In re Mishkin,* 85 B.R. 18, 22 (Bankr.S.D.N.Y.1988). We would, under this standard, be inclined to reduce the Claimant's commission even if we did not strike it entirely. Receipt of $500,000 for a day or two of work-time is, in our view, unconscionable.